Mr. Justice Hagner
delivered 'the opinion of the Court:
This is an action brought by Armes, a real-estate broker» to recover a sum of money claimed as commissions upon the sale of a valuable property in this city, which the plaintiff alleges he was employed by Cameron to sell. The verdict below was for the defendant.
The first count in the declaration sets forth that in 1885, the plaintiff, being a duly authorized and licensed real estate agent and broker in the city of Washington, at the special .instance and request of the defendant, undertook and agreed with the said defendant to make sale of the residence of the defendant in Washington, upon such terms and conditions as should be acceptable to the defendant, and that afterwards, on May'9, 1885, the plaintiff made sale of said residence with the furniture therein contained and the stable thereto attached, for the sum of $95,000; and the said residence and furniture was thereupon sold and conveyed by the said defendant to that person who the said plaintiff, at the instance and request of the defendant, had procured and induced to purchase the same, and the defendant, in consideration thereof, undertook and then and there promised to pay to the plaintiff as much money as the services of the plaintiff in securing a sale of the said defendant’s residence and furniture and stable were reasonably worth ; and that the said services so as aforesaid rendered were reasonably worth $2,850.
The second count states that the defendant authorized the plaintiff to sell the said premises upon such 'terms as should be satisfactory, and that afterwards, acting on the authority of the defendant, the plaintiff secured a purchaser for the said residence, with the furniture and stable, and *438 thereby became- entitled to his commissions, which the defendant refused to pay.
The statements of the employment of the plaintiff by the defendant differ very essentially from the testimony given at the trial by the plaintiff, who was the only witness in his behalf on the point. His statement is thus set out in the exception:
“In the month of February, 1885, I met the defendant Cameron, with whom I had been acquainted for several years, and who was the owner of a certain house and lot on Sixteenth street, and asked him if his house was for sale. The defendant remarked, ‘What could you get for it?’I said, ‘About $75,000 or $80,000.’ He said, ‘Well, I won’t take that for it.’ I said, ‘ What is your lowest price ? ’ He said, ‘ $100,000, and if you can get $100,000 you can sell it.’ Just then he started to take the car and I went back to my office. He turned around and called me back, and says, ‘ Now be careful. I don’t want you to hawk this house about town. I don’t want it advertised and hawked through the city as being for sale.’ Then he jumped in the car and went on. I put it on my books at $100,000', but did not advertise it in any paper.”
On cross-examination, he testified:
“ Question. Flow long did your interview last ? — Answer. Long enough to state what I just stated a few moments ago with regard to the price of the house and the terms ; then he took a street car and went right to the Capitol. I asked him what he would take for his house. Flis reply was, ‘ What could you get for it.’ And I told him about $75,000 or $80,000. He said that would not buy it. I said, ‘ What is your lowest price?’ He said, ‘$100,000. If you can get $100,000 for it you can sell it.’ ”
It is perfectly clear, from the testimony of the plaintiff, that his engagement was conditional, to sell the house alone for $100,000, and not for such sum as might be acceptable thereafter to-the defendant. No "reference appears in his *439 statement of the emplqyment to the,sale.of thé stable or furniture.. , And there, is not .a word of testimony in the case to show there was ever any engagement or modification of those special terms, assuming the alleged agreement was really made or that- Cameron ever' assented to'the proposir tion that he should sell the house, for a less sum than $100,000; or that he should sell the furniture or the stable. The further testimony of the plaintiff is' thus staled in the bill of exceptions : ■
“The said plaintiff further gave evidence to the jury tending to show that afterwards, and in the month of April, 1885, said Armes showed said premises to one D. P. Morgan, who made an offer of $80,000 therefor, which offer was communicated to the defendant by telegraph,.but no answer was received from him by the plaintiff.”
On cross-examination Mr. Cameron is asked whether he did recéive the following dispatch of April 17, which wé may presume is the one the plaintiff says he sent :
“I am authorized by a gentleman in the city to offer you $80,000 cash for your house at the corner of Sixteenth street and Rhode Island avenue.” > Up to this time nothing-had been said about the stable. The house or residence which alone was the subject of the conversation at the first interview, as detailed by the plaintiff, is also the only property mentioned in the telegram. “ But no answer was received from him by the plaintiff; that afterwards said plaintiff took said Morgan again, with his family, to examine the said premises, and that said Morgan then offered to purchase the said property at-the price of $80,000 cash, and the said plaintiff thereupon sent by mail to the said defendant this letter dated April 21, 1885:
Washington, D. C., April 21.
Hori. J. D. Cameron :

Los Angeles, Gal.:

Dear Sir,: I submitted an offer of $80,000 cash, .to *440 your wife last week for your house and stable,” and she telegraphed to Santa Fe, N. M., but as no reply has been received, her brother, John Sherman, telegraphed to day to Albuquerque. I have an offer of $90,000 for house and stable including the furniture. I wish you would telegraph me upon receipt of this your action as to what you will do in the matter, and where a deed will reach you for signature, if the offer is accepted. Please give me your lowest terms, with or without furniture, including stable.
Yours, truly,
G. A. Armes.
“That the plaintiff received no answer to said letter, but afterwards, in May, 1885, the defendant sold the said house to said Morgan at the price of $95,000; that the fact of such sale was learned by the said plaintiff on the 9th of May, 1885, and he thereupon telegraphed to the defendant as follows:
“Morgan, my customer in purchasing your house; expect commission from you. Particulars mailed. G. A. Armes.”
That closed the testimony for the plaintiff except that he said, in rebuttal, he informed Thomas J. Fisher, of the firm of Thomas J. Fisher & Co., in April, he was trying to sell Cameron’s house to Morgan and had submitted an offer from him for it.
Another member of the firm of Fisher & Co., Mr. Stellwagen, testified he did not know Armes had any connection with the transaction.
It is proper to state what Mr. Cameron’s testimony is as to the interview, although in deciding the case we must remember the jury might have believed all that Mr. Armes said in preference to what was said on the other side; and the correctness of the rulings below must be considered with reference to that possibility.
Mr. Cameron says: “ I have known of the plaintiff for ten or twelve years. I can hardly say that I am acquainted *441 with him up to this time, so little has been our intercourse. I heard all his testimony. I remember meeting him at the corner of Fourteenth and F streets. It was a very brief interview. He asked if my house was for sale, and I told him that it was not. He attempted to continue the conversation and I told him that I did not want my house hawked about for sale. ■ lie still attempted to continue it and I jumped on a street car to get rid of him. That is all I had to do with it. Q. He says that you told him that he might sell it if he could get $100,000 for it? — A. I did not. There was no sum mentioned that I heard. Q. Was there any desire on your part to sell your house ? — A. None whatever. It was in the morning. I was on my way to the Capitol. I took a car this time to get rid of him. I resided then at the corner of Sixteenth street and Rhode Island avenue. Q. In this house? — A. Yes, sir. Q. What time did you go to 'California in that spring? — A. I started on the 15th of April and stayed at a placo called Sierra Madre Villa, about fourteen miles from Los Angeles. I was there six months, generally all the time. I was at that house every night during my absence. I started from California on the 20th of October, and got home to Harrisburg about the 28th or 29th. I came here to Washington some time during November. He came to see me here soon after my arrival at Mrs. Sherman’s house on Seventeeth street. I do not recollectwhathe said,exceptthat he claimed a commission. I told him that he had no authority to sell it and was not entitled to any commission. He asked me if I would not give him something. He said he had a family to support and asked me if I would not give him a contribution. That’s about the substance of it. He was there some time. When I told him he had no authority to sell the house he did not say that he had. I think about two years ago I met him on the Woodley Lane Road. He introduced the subject and I told him I would not give him any commission. Q. While you were in California, did you have any communication from *442 him ? — A, I, did; the one that has. been read in court. I paid no attention to that. I did not reply and never wrote him. Q. Did you ever have any dealings with him of any kind? — A. Never. Q. Have you any knowledge that he did anything in the way of selling this house or getting Mr. Morgan to buy it ? — A. I have no knowledge of anything. Mr. Fisher has always been my agent and attended to my real estate business here almost ever since I have been living in Washington — -twelve or thirteen years ago. Q,. Did Mr. Greene have anything to do with reference to your business? — A. Generally, he had. If I was absent from home and he was called upon he looked after my affairs as a personal friend. This house was sold to Caroline Fellows Morgan for $95,000, through Mr. Fisher’s office. Q. With reference to this particular piece of property, was it on the plaintiff’s books for sale and advertised for sale with your consent and knowledge? — A. Not by my authority. Q,. Was it ever on Fisher’s books? — A. No, sir.”
This is sufficient to show how utterly at variance the parties are as to the facts. Then, on cross-examination, these questions are put to Mr. Cameron :
Q. Did you send this dispatch of May 9th to Mr. Greene? —A. I take it that I did, sir. Q. Here is one of May 8th. Did you also send that to Mr. Greene? — A. I did.
This dispatch is as follows :
May 8, 1885.
Capt. F. V. Greene :
I- will take $90,000 for the house alone and give immediate possession. (Signed), J. D. Cameron.
“Q. You sent that to Mr. Greene? — A. I did. Q,. That was after you had gotten the letter from Mr. Armes ? A. — Certainly. Q. Here is one of May 9th- to Capt. F. V. Greene :
“ ‘ He can have the house and the carpets and stationery furniture, Mrs. Cameron to decide what is to be included, and the stable, for $95,000 net; that is, he to pay all commission. J. D. C,ameron.’
*443 “ A. -I sent that; yes, sir. Q. Here is one of May 13,. 1885:
“ ‘To Capt. Greene, Washington, D. 0.:
“‘I will accept Morgan’s offer of $95,000 for house, furniture and stable, and will pay Fisher’s commission of $500. I understand the furniture to mean the ordinary furniture-of a house; Mrs. Cameron to decide if this is satisfactory. J. D. Cameron.’
“ Q. You sent that? — A. I did, sir. Q,. What led to your sending that dispatch of May 8 ? — A. A dispatch from Capt. Greene. Q,. Have you got'that dispatch? — A. I have not. Q. What was the price at which you held your house ? — A. I did not hold it for any price. In reality, I was not anxious to sell; but I concluded that I would take $100,000-for it, if I could get that amount. Q. What was the purport of that dispatch from Capt. Greene? — A. That Mr. Morgan wanted to buy my house. I cannot state the language. I did not hear of Mrs. Morgan in the .transaction until the deed was presented. Mr. Greene was an intimate friend of mine. Q,. Did you do anything or indicate to Mr. Greene in any way that Mr. Armes had communicated with you about this subject? — A. I think Capt. Greene, communicated with me after Mr. Armes did. I cannot recall whether I did or did not. I did not consider Mr. Armes in the matter at all. • I heard that Mi*. Armes was-taking customers to my house; that he was taking Mr. Morgan there. He certainly did not have any permission from me. Q. You knew that he did go through, and did you ever object or make known to him that he had no right, to go through there? — A. No, sir; I did not have any communication with him at all. I communicated with Mrs. Cameron. Q,. Did you instruct Mrs. Cameron not to allow him. to- come, into the house? — A. I certainly did object to-his coming there. Q. You did not communicate any such, thing as that to Mr. Armes? — A. Certainly not.- 'Q. Did you know that'Mr. Armes went into.your house two or. *444 three.times? — A. I had no knowledge as to how often he went there.
“ Q. Did you write or telegraph to your wife after knowing Mr. Armes was engaged in negotiating for this house •and that he had been there, not to allow him to come into the house or to bring purchasers there? — A. I don’t know whether I told her to order him out of the house or not. I do not recollect that; but I simply telegraphed to her that he had nothing whatever to do with the sale of the house.”
Three other witnesses were produced on behalf of the defendant, one of whom, his secretary, was present when Mr. Armes called on Cameron after his return and asked for commissions. He testifies no claim was then made by Armes that lie had been authorized to sell the house. Mr. Stellwagen says that on May 8, Mr. Morgan, who had been in treaty with them for some months about buying a house in town asked them about this house. Then they submitted to Capt. Greene, whom they knew was the friend and agent of Mr. Cameron, these offers that Mr. Morgan had made “for the house alone $85,000 ; $90,000 for house and furniture, and $95,000 for house, furniture and stable. He says this is the very best he will do. If you'think it worth while you might telegraph Mr. Cameron or answer to us yourself, so that we can' give Mr. Morgan an answer Monday morning.”
A telegram was thereupon sent by Captain Greene to Mr. ■Cameron and the result was a reply in which this offer of $95,000 for house, furniture and stable was accepted and a deed was given by Mr. Cameron through Mr. Greene in furtherance of this agreement and Morgan paid the money.
It is insisted that under this evidence, the plaintiff is •entitled to commissions on the sum for which the house, furniture and stable were sold, upon the principle that where a broker employed to make a sale produces a purchaser, with whom the owner completes the sale, as the result of the broker’s efforts, the latter is entitled to his com *445 missions, notwithstanding the sum accepted is less than that originally demanded. But this principle is to be modified according to the form of the contract. Thus, where the contract is special and the broker is restricted as to the price, as we have shown the plaintiff was, in this case, according to his own testimony, we conceive the law to be, that he is only entitled to his commissions upon compliance with the special conditions of that contract; unless it is shown that the owner waived such restriction and authorized the broker to make a new contract with the proposed purchaser.
The parties had the right to make a contract of this description, or one still more restricted ; as in Koch vs. Emmerling, 22 How., 74, where the Supreme Court, denying that the vendor might capriciously defeat his own contract wdth his agent by refusing to pay him when he liad done all he was bound to do, added :
“ Such a state of things could only arise from an express understanding that the vendor was to pay nothing, unless he should choose to make the sale.”
An instance of such a special contract is given in Jones vs. Adler, 34 Md., 443. There the contract between the owner and the broker was that the latter was not to receive commissions unless he should sell the property for $16,000 j hut during the negotiations the owner agreed to take $14,000, and the sale was made by the broker at the latter price. The court held the broker was entitled to recover commission on the amount of sales, under these circumstances ; but said: “ Where there is a special contract, by the terms of which the broker is not to be paid commissions unless he sells the property at a specified price, the sale by him at such a price is a condition precedent to his right to compensation, unless, pending the negotiations, and where his agency remains unrevoked, the owner consents to a sale for a sum other than originally agreed upon.”
So in Schwartze vs. Yearly, 31 Md., 278, the court said :
*446 “ If there were a special contract by which the appellee was not to receive any compensation unless • the property was sold at a stated price, he was not entitled to recover unless the property was sold at that price; or, unless he introduced a purchaser who was willing to buy, and was prevented from making the sale by the fault of the defendant,”
The broker confessedly failed to produce a purchaser of the house alone at $100,000, and in the face of that failure he cannot properly claim his commissions. In 29 Md., 512, the owner agreed with a broker to pay 2| per cent, commissions if he should sell a house on acceptable terms. The broker produced a purchaser wNo signed a contract, with forefeit, but he failed to comply and gave-a note in payment of the forfeit. On suit by the broker for his commissions, it was held the plaintiff was not entitled to recover as he had not produced a purchaser who proved ready and willing to complete the purchase.
Again, to entitle the broker -to commissions, where the owner himself makes the sale to the party who had been Introduced by the broker, it must appear the owner assented to the terms upon which the broker could have sold the land; but if the owner refuses to sell at the highest offer produced by the broker, and then proceeds, in person, or through another broker, to sell for a better price to another; the rule cannot apply.
Thus, in Richards vs. Jackson, 31 Md., 250, a proprietor employed a broker to sell his house in fee simple for $5,000. The broker found a purchaser, Johnson, at $3,500, who signed a written contract to pay the money on execution of the deed, and paid the owner a sum. on account, to be refunded if the title proved imperfect. The purchaser being advised the title was not good, refused to complete the purchase. The owner himself then sold the property for $5,000 to another person, and received $3,500 in cash, the balance to be paid after the title had been perfected. *447 In a suit instituted for the purpose, the title was declared-to be good, and the new purchaser completed his payment. In a suit by the broker to recover commissions on the sale to Johnson, the first contractor, it was held he was not’ -entitled to recover, as Johnson had not complied with his contract, although his failure to do so was based Upon an erroneous ground, the title being really good.
In the case at bar, the highest offer ever submitted by the plaintiff was $90,000 for everything, including the stable and furniture, although Cameron never had author-' ized him in any way to dispose of the stable or furniture. Cameron never agreed to this price'and took no .notice whatever of the offer. Surely the defendant had sufficient -control left over his own property, after this curbstone talk with the plaintiff, to have the right to refuse the sum thus offered ; and he never did agree to receive anything less than $95,000 in cash, free of charge for commissions. Up to that time the plaintiff had not become entitled to commissions; and the defendant had the right to revoke any supposed agency at his pleasure. Armes had neither earned compensation by selling for $100,000, the stipulated price» nor by procuring any offer that Cameron ever accepted • and in the language of Schwartze vs. Yearly, 31 Md., 278, “If the agency be revoked before the agent becomes entitled to commission, and the property be placed in the hands of another agent who makes the sale, the principal is not liable to the first broker.”
It is evident Mr. Morgan had relinquished whatever dealings with the plaintiff he may have had up to April 21; for early in May he applied to Fisher & Co. to buy the property, and every step thereafter in the transaction was taken by him with Fisher & Co., and Greene, as the agent of Cameron. The precise condition of affairs seems to be that represented in Livezy vs. Miller, 61 Md., 337, where it was decided, that although a broker is entitled to his commissions if the sale be effected through his instrumentality, *448 yet if the negotiations he has set on foot are completely broken off by disagreement as to the price, and the property is afterwards sold to the same party by another broker on the same terms as originally offered, except a modification somewhat less favorable to the owner, the first broker is not entitled to commissions.
Of course Armes could have no right to sell at $90,000, or at any price, without consent of Cameron. His mission, conceding the correctness of his testimony, was only,to find a purchaser, and not to conclude and execute a binding contract. Ryan vs. McGee, 2 Mackey, 17; Hamilton vs. Cutts, 6 Mackey, 219.
We have examined all the cases cited in behalf of the plaintiff with care, but we see nothing in any of them at variance with our conclusions in the case.
The justice in his charge correctly.stated the principles which govern the case. The prayer in behalf of the plaintiff was properly rejected, because the law was properly stated in the charge; and also because that prayer left it to the jury to find the defendant was emplojmd to obtain a purchaser for the house and furniture and stable, although, as we have seen, there was no evidence adduced by the plaintiff to show he was ever authorized to sell the furniture or stable on any terms, even according to his own statement of the alleged employment.

The rulings below are affirmed.